UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MAURICE WILKINS,

      Plaintiff,

      v.

MS. MILLER, *et al.*,

      Defendants.

CIVIL ACTION NO. 3:24-cv-02026

(SAPORITO, J.)

## <u>MEMORANDUM</u>

Plaintiff Maurice Wilkins, incarcerated at SCI-Huntingdon, proceeds on First and Eighth Amendment claims against two dieticians employed by the Pennsylvania Department of Corrections ("DOC"), after they discontinued his gluten-free diet. Defendants have moved for summary judgment. (Doc. 35).

Because the evidence does not support a reasonable inference that the dieticians revoked Wilkins's diet in retaliation for his complaints, they are entitled to summary judgment on that claim. However, because Wilkins has presented substantial evidence that he is being denied a medically necessary diet, his Eighth Amendment injunctive relief claim will proceed to trial against defendant Wilson. In addition, his request for preliminary injunctive relief will be granted in part. Wilson will be

ordered to ensure that Wilkins is re-evaluated and provided any medically necessary diet within 21 days of this memorandum and order.

## I.   BACKGROUND

Wilkins filed his initial complaint on November 21, 2024. (Doc. 1). In brief, he alleged that he has Celiac disease and has required a gluten-free and corn-free diet for many years. In May 2024, he learned that his diet would not be "renewed" by the prison dieticians, because he bought items from the commissary that conflicted with his diet and refused to sign an agreement not to do so. He alleged that other inmates on therapeutic diets "buy commissary not aligned with their diet," and are not "harassed" or denied their prescribed diet.

The Court permitted Wilkins to proceed on First Amendment retaliation claims, and Eighth Amendment claims premised on denial of a nutritionally adequate diet, against two dieticians, Felicia Miller and Chelsea Wilson. *See* (Doc. 8). The Court also construed Wilkins as requesting preliminary injunctive relief and directed appropriate briefing. *See* (Docs. 5, 20, 24). Following defendants' unsuccessful motion to dismiss the complaint, *see* (Docs. 17, 18), the case was stayed while the Court attempted to recruit *pro bono* counsel for Wilkins. The Court was

unable to recruit counsel, and the case resumed with Wilkins litigating *pro se*. (Docs. 26, 34). Discovery has now completed, and the defendants seek summary judgment.

## II.  LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.    MATERIAL FACTS[1]

Taking all facts and reasonable inferences in favor of Wilkins, the

---

[1] No party has filed a proper statement of material facts. *See* Fed. R. Civ. P. 56, M.D. Pa. L.R. 56.1. Plaintiff's statement of material facts is
*(continued on next page)*

non-movant, the summary judgment record indicates as follows:

Wilkins, a prisoner in DOC custody since at least May 2013, has Celiac disease and a corn allergy. Celiac disease causes inflammation of the small intestine from the consumption of gluten, and "[p]eople with Celiac disease cannot tolerate gluten." There is no recognized cure, and treatment generally requires "a lifelong gluten-free diet." *See* (Doc. 36-9, ¶¶ 5, 12, 13; Doc. 40-11). In May 2020, the DOC "confirmed" Wilkins's diagnosis of Celiac disease and prescribed him a "Gluten Free, No Corn diet." (Doc. 1-5 at 10). However, in August 2021, a Celiac Disease Panel revealed "no clinically significant findings" related to Celiac disease. *See* (Doc. 36-10 at 10-11). Despite these apparently conflicting results, the DOC and its dieticians acknowledged Wilkins's need for a medical diet through April 2024.

### A. Wilkins's Diet Complaints

Wilkins's medical diet has been a subject of ongoing dispute

---

unsupported by citation to the record, *see* (Doc. 40 at 5-7), while defendants' statement of facts consists largely of legal conclusions, see, *e.g.*, (Doc. 36, ¶¶ 15, 17, 19, 20, 30, 35, 45). Nonetheless, in the interest of considering this matter on the merits, we have reviewed all the evidence the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3). Wilkins's "Motion for Default Judgment" (Doc. 44), premised on perceived errors in defendants' statement of facts, will be denied.

between Wilkins and the DOC. *See* (Doc. 40-4) (listing approximately 40 food-related grievances since December 2019). In 2022, in a previous case in this district, Wilkins reached a settlement with a DOC dietician, Anne Brown, on an Eighth Amendment claim premised on the alleged denial of a medically adequate diet. *See Wilkins v. Wolf*, No. 1:20-CV-00540 (M.D. Pa.) (Docs. 66, 67, 72, 73).

More recently, on March 19 and April 2, 2024, Wilkins complained to Craig Copper, Chief of the DOC's Food Services Division, about the content of his diet. In brief, Wilkins alleged that after a recent "refresh" of the prison menu, numerous meals served to him had contained gluten or corn. Although some of these items were removed after Wilkins complained, "there were still some conflicts on the menu." In addition, Wilkins believed he was now receiving inferior food, such as "excessive bean meals," after the refresh. Wilkins claimed that the dieticians were "using food as a punishment" for his prior complaints. E-mail exchanges among DOC employees document their efforts to address the "conflicts" within the new diet, such as removing certain foods that they discovered to contain corn syrup. (Doc. 36-3 at 2-6). Ultimately, Copper responded to the letters, emphasizing that Wilkins's "medical need is for Gluten Free

No Corn ingredients," not any particular food, and explaining the basis for various food choices for his diet. (*Id.* at 9-13).

### B. Revocation of Wilkins's Diet

The record shows that around the time of his letters to Copper, Wilkins was sporadically refusing his diet tray and accepting a "regular" tray at mealtimes. The DOC documented that on March 6, 7, 8, 18, and 20, he refused his diet tray, and on March 12, 14, and 15, he accepted a regular tray. *See* (Doc. 36-7). Wilkins was also running what he describes as a "store" by purchasing foods from the commissary, including foods that contain gluten and/or corn, and selling or trading them with other inmates. Wilkins and other prisoners attest that he was not eating any food containing gluten or corn; he was either obtaining foods to trade or eating foods from regular trays that he believed did not contain gluten or corn. *See* (Doc. 40-6 at 3-8).

On March 25, defendant Chelsea Wilson, a DOC dietician, sent an e-mail to various DOC employees: "If [Wilkins is] refusing the diet tray, taking a regular tray and ordering gluten/corn containing items in commissary[,] he is making it clear, he doesn't want the diet and isn't experiencing side effects from these items." (Doc. 36-4 at 3). On March

- 7 -

28, Wilson drafted an "addendum" to Wilkins's medical notes describing his commissary purchases: "pop-tarts, fish sticks in hot sauce, townhouse crackers, oatmeal that isn't identif[ied] as gluten free, bagels, flour tortillas and sandwich cracker cookies. These items contain gluten and likely . . . high fructose corn syrup." (Doc. 36-8 at 153). Wilson told the staff that if Wilkins's diet was not medically necessary, he should be removed from it. (Doc. 40-7 at 12).

The issue came to a head when Wilkins refused to sign a "Receipt of Therapeutic Diet Rules" Form, DC-465-C. Under DOC policy, inmates receiving a medical diet "shall have the rules for the Therapeutic Diet Program explained to them by the medical staff and shall sign a receipt for their copy of the rules by using the DC-465-C." In general, the form requires inmates receiving a medical diet to agree not to take more than the prescribed amount of food, give away food, or receive food not prescribed by the diet, among other rules.

A previous version of the form required inmates to "receive all scheduled meals" and not possess "food items that are not prepared on the diet tray," but did not specifically address the commissary. (Doc. 40-5). In April 2024, Wilkins was asked to sign an updated version of the

form, which required him to "[e]nsure that the food [he] purchase[s] from commissary follows with the diet restrictions . . . Foods purchased via commissary are presumed to the consumed by the person purchasing them. I understand that if I make commissary purchases not part of my therapeutic diet it shows that I do not want to be on a therapeutic diet and I may be removed from the diet program." (Doc. 40-6). Wilkins refused to sign this form, believing that the additional stipulations were unlawful and that he was being personally targeted for prior complaints about his diet.

Wilkins's medical records indicate that on April 12 and 18, he met with physician assistant Gabrielle Smith to discuss his medical diet. The records reflect that a scheduled renewal of Wilkins's diet was "denied due to commissary purchases."[2] Wilkins told Smith that he "only takes regular trays to get the protein source (does not take any corn or gluten products)" because he believed the diet tray offered inadequate protein. He also admitted to "purchas[ing] items on commissary for other people." (Doc. 36-8 at 137, 141). On April 18, Wilson drafted an addendum to

---

[2] The record is unclear as to the precise date Wilkins's diet expired, but that does not affect the outcome of the motion.

Wilkins's medical notes to reflect that his "diet renewal is not approved at this time":

> Inmate is purchasing items in commissary that contain corn: 5 Cheetos crunch and 20 Oreos as well as gluten: 50 Ramen Noodles, 20 Oreos and 10 fish sticks in hot sauce within the last month . . . The provider met with the inmate who refused to sign the DC465-C receipt of therapeutic diet rules . . .

> Provider noted to this writer that sensitivity is very low therefore a reaction is unlikely. Due to non-compliance with therapeutic diet trays, commissary and refusal to sign DC-465C receipt of therapeutic diet rules . . . the requested gluten free, no corn diet renewal will not be approved at this time. Inmate may request to be placed back on a gluten free, no corn diet at any time after he signs the DC-465C receipt of therapeutic diet rules and commissary is compliant with dietary restriction.

(Doc. 36-8 at 145).

## C.    Aftermath of Revocation

After his diet was discontinued, Wilkins repeatedly complained to medical staff about gastrointestinal symptoms or lack of adequate food. On June 20, 2024, Wilkins attended a sick call and told PA Smith that he had "not been eating his trays since his diet order was discontinued." (Doc. 36-8 at 114). Ultimately, he began to eat foods from the regular trays that contained corn and gluten. On July 3, a provider documented the following complaints:

> Patient [complains of] not having a gluten free diet at this time which is causing him GI distress. Having stomach upset and loose bowels over the last week or so. Believes that he is moving his bowels 10-15 times a day at this time. Was trying to just eat commissary but it became too expensive for him to maintain . . . Noting today that he orders these foods and runs a store in the jail selling the gluten containing foods to other inmates. He denies ever eating any gluten containing foods until the past week when he started eating the regular trays.

(*Id.* at 111). The provider wrote: "The dietician did note that if [Wilkins] agreed to sign the therapeutic rules, she would approve his diet again." (*Id.* at 112).

On September 20, at a sick call, Wilkins complained of "excess gas/bloating, abdominal pain, and diarrhea for the las[t] few months." He reported that he was eating the "normal" trays, and that his symptoms occurred "almost every time he eats." In response, nurse Jaclyn Talasky "discussed [the] risk of eating gluten with [C]eliac disease. Inmate has refused to sign DC 465C and dietician will not approve it otherwise due to commissary purchases." (*Id.* at 90-91). On December 20, Wilkins reported gas/bloating, diarrhea, fatigue and joint pain, which he "believe[d] was related" to Celiac disease; he stated that he "tries to avoid gluten in his diet but is limited." (*Id.* at 57).

## IV.   SUMMARY JUDGMENT

Wilkins proceeds on First Amendment retaliation claims, and Eighth Amendment claims premised on the denial of a medically adequate diet, against defendants Miller and Wilson.

### A. Retaliation

To state a *prima facie* case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the plaintiff's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (citations and quotations omitted). Typically, the plaintiff must show "unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing to establish a causal link." *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016).

In some cases, causation can be established "from the evidence gleaned from the record as a whole." *Id.*  Even if the plaintiff states a

*prima facie* case, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).

In his complaint, Wilkins ascribed a variety of perceived problems with his diet to his "prior civil suit and high volumes of grievances." *See* (Doc. 1 at 13). However, his summary judgment brief indicates that the alleged retaliatory action in this case is the revocation of the diet, not "excessive bean meals" or any other complaint about the diet itself.[3] *See* (Doc. 40 at 11-13) ("It is clear that the complaints [led] up to this retaliatory action upon the plaintiff . . . [A]ll the protected activity . . . occurred from January to April of 2024 and the end result was the denial [of the medical diet].").

Even if Wilkins could state a *prima facie* case of retaliation

---

[3] We have previously noted that if Wilkins wanted to pursue a retaliation claim based on changes to diet menus, he had not plausibly explained how these changes applicable to numerous inmates in the DOC were intended to punish him specifically. *See* (Doc. 7 at 9, n.4). Regardless, the record indicates that the "refresh" of the menus arose from a broader review of all therapeutic diets, not from Wilkins's protected activity. *See* (Doc. 36-3 at 9-11, 13).

premised on the revocation of his diet, defendants are entitled to summary judgment because they have shown that they would have made the same decisions regardless of his complaints. The record indicates that Wilson initially decided to revoke the diet because of Wilkins's perceived "low sensitivity" to gluten, his failure to take the appropriate trays at mealtimes, his use of the commissary, and his refusal to sign the DC-465C form. *See* (Doc. 36-8 at 145). Regardless of whether that decision was justified, it is beyond dispute that the defendants were acting to enforce the prison's own rules, which effectively forecloses any claim that they acted out of retaliation. *See Carter v. McGrady*, 292 F.3d 152, 158-59 (3d Cir. 2002) ("Even if prison officials were motivated by animus . . . we cannot say that the disciplinary action taken against Carter was retaliatory."); *Ford v. Smith*, No. 4:21-CV-1957, 2024 WL 4341350, at *14 (M.D. Pa. Sept. 27, 2024).

Wilkins argues that prior complaints about his diet "plausibly suggest" a retaliatory motive, but at this stage, plausibility is not enough. Given defendants' evidence of non-retaliatory reasons for the decision, he must present evidence that the defendants were motivated in the way he claims. He has not presented such evidence; to the contrary, the only

evidence that his complaints influenced the DOC's decision-making is an e-mail chain in which staff resolved to "double check" the menu for accuracy. *See* (Doc. 36-3 at 2-6). Therefore, defendants are entitled to summary judgment on his retaliation claims.

## B. Eighth Amendment

In general, an Eighth Amendment violation exists when a prison official deprives an inmate of "the minimal civilized measure of life's necessities," and the official is deliberately indifferent to the inmate's health or safety. *See Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The Eighth Amendment therefore requires that inmates receive a "nutritionally adequate diet," *Laufgas v. Speziale*, 263 F. App'x 192, 198 (3d Cir. 2008), free of food that "present[s] an immediate danger to the health and well being of the inmates who consume it." *Nguien v. Pennsylvania Dep't of Corr.*, No. 3:18-CV-0209, 2023 WL 2527353, at *11 (W.D. Pa. Mar. 15, 2023) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). This may include the elimination of allergens or foods that are dangerous to the inmate. *See, e.g.*, *Jackson v. Gordon*, 145 F. App'x 774, 776 (3d Cir. 2005) (lactose intolerance and allergy to eggs).

- 15 -

Claims of a denial of a necessary medical diet are evaluated by the same deliberate indifference standards as other Eighth Amendment medical care claims. *See Bailey v. Jurnak*, No. 3:18-CV-1437, 2019 WL 3784570, at *3 (M.D. Pa. July 19, 2019) (listing cases). Under this standard, deliberate indifference can be shown where the prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

We agree with the defendants that Wilson's initial decision to revoke Wilkins's diet does not itself demonstrate deliberate indifference. Even if Wilson was wrong in her initial belief that Wilkins would show a "low sensitivity" to gluten, that error would not be a constitutional violation. *See Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (an "error in medical judgment" is not deliberate indifference). The initial judgment was buttressed by evidence that Wilkins was obtaining gluten-containing foods, which is a relevant consideration, although not

dispositive.[4] Contrary to Wilkins's argument, he has no constitutional right of access to the commissary or to barter food. *See Travillion v. Allegheny Cnty. Bureau of Corr.*, No. 2:07-CV-928, 2008 WL 2699988, at *2 (W.D. Pa. July 7, 2008) (collecting cases).

However, the record indicates that Wilkins is no longer being denied the diet based on a genuine assessment of his needs. Rather, Wilson and the DOC are refusing to even consider renewing Wilkins's medical diet unless he signs Form DC-465-C, despite the medical staff's own notes suggesting that he needs it.[5] *See Phoenix v. Amonette*, 95 F.4th 852, 860

---

[4] *See, e.g.*, *Young v. Beard*, No. CIV.A. 06-160, 2008 WL 2693860, at *8 (W.D. Pa. Apr. 4, 2008), report and recommendation adopted as modified, 2008 WL 2693859 (W.D. Pa. June 30, 2008); *Contant v. Lowe*, 450 F. App'x 187, 189 (3d Cir. 2011) (religious diet discontinued based on commissary purchases); *see also* DC-ADM 610, § 2(D)(7): "The Department Dietitian may utilize the Meal Management System as well as review commissary purchases to assess need for a therapeutic diet and make appropriate recommendations regarding nutrition interventions." (Doc. 36-5 at 6).

[5] *See* (Doc. 36-8 at 90-91 (acknowledging the "risk of eating gluten with [C]eliac disease. Inmate has refused to sign DC 465C and dietician will not approve it otherwise due to commissary purchases"), 112 ("[I]f [Wilkins] agreed to sign the therapeutic rules, [Wilson] would approve his diet again."); *see also* Doc. 36-9 at 7 ("The Plaintiff continues to have the opportunity to return to medical at any time to request a gluten free, no corn diet and sign the DC-465C that was noted on the 4/12/2024 diet order . . ."). The conditional offers to restore Wilkins's diet further suggest
*(continued on next page)*

- 17 -

(4th Cir. 2024) (despite plaintiff's commissary purchases, medical staff's "words and actions" contradicted any justification for later revoking his gluten-free diet). This policy potentially violates the Eighth Amendment; if Wilkins needs a nutritionally adequate diet, the DOC must provide it.[6] From this record, a reasonable jury could infer Wilson's deliberate indifference to his need for a medical diet.[7]

Defendants argue that Wilkins's commissary purchases equate to

---

Wilson's awareness of the medical need, given her statement that such diets "should always be avoided when medically able." (Doc. 40-7 at 12).

[6] There are cases in which inmates refused to accept food from staff in a manner consistent with prison safety, and courts determined that denying them food was not an Eighth Amendment violation. *See, e.g.*, *Freeman v. Berge*, 441 F.3d 543, 544-45 (7th Cir. 2006) (inmate wore a sock that could be used as a weapon, and his cell walls were smeared with blood and feces that he refused to clean); *Talib v. Gilley*, 138 F.3d 211, 214-15 (5th Cir. 1998) (during a lockdown caused by violence in the prison, inmate refused to face the wall and assume a "non-threatening position" to receive food in his cell). Defendants do not point to any such safety concerns here, and none are apparent from the record.

[7] Defendants cite to Wilkins's medical records for the proposition that Wilkins cannot "proffer competent, admissible evidence that any perceived symptoms were actually caused by his diet's non-renewal" (Doc. 36 at 10, ¶ 34), but it is unclear how the cited records support that statement. Nor is Wilkins required to specifically establish damage to his "long-term health" (Doc. 37 at 20) to sustain an Eighth Amendment claim; the "unnecessary and wanton infliction of pain" is sufficient. *See Rouse*, 182 F.3d at 197.

"non-compliance" or a "refusal to follow treatment" that essentially waives an inmate's claim to a medical diet[8], but that position is not supported by case law. Commissary purchases are not dispositive of an inmate's dietary needs, particularly where there is no evidence that the person has consumed the disputed food.[9] *See Phoenix*, 95 F.4th at 855, 860; *Nguien*, 2023 WL 2527353, at *6 (finding an issue of fact as to an inmate's dietary needs where the record was "unclear" if he had consumed his non-compliant commissary purchases); *see also Jamison v. Clarke*, No. 7:18-CV-00504, 2021 WL 969201, at *11 (W.D. Va. Mar. 15, 2021); *Holleman v. Wexford Health of Indiana, Inc.*, No. 2:19-CV-00366-JPH-MJD, 2020 WL 2097783, at *2 (S.D. Ind. May 1, 2020) (inmate

---

[8] *See, e.g.*, (Doc. 37 at 25) ("Plaintiff's failure to conform to the rules of his therapeutic diets to satisfy his wants does not enable him to produce competent, admissible evidence to claim Defendants did not meet, or attempt to meet, his medical needs.").

[9] Defendants' reliance on *Rettew v. Abbey*, No. 13-CV-1973, 2013 WL 3914644 (E.D. Pa. July 30, 2013), is unpersuasive. In that case, a prisoner refused medication and then tried to claim that the same drug was medically necessary. *See id.* at *5. By contrast, Wilkins has consistently claimed that he has a medical need for a gluten-free diet, and defendants present no evidence that he ingested any food contrary to that diet before they revoked it.

showed reasonable probability of success on the merits after his "gluten-free diet for twelve years [was] discontinued" based on commissary purchases).

Clearly, the DOC can consider Wilkins's tray choices or commissary purchases as they "*assess need* for a therapeutic diet." *See* DC-ADM 610, § 2(D)(7) (emphasis added). It can impose "appropriate discipline" on inmates for taking food to which they are not entitled, as it has apparently done in the past. *See* (Doc. 40-5 at 2). It can also limit Wilkins's use (or abuse) of the commissary. *See* DC-ADM 815, § 2; *Travillion*, 2008 WL 2699988, at *2; *Miller v. Conway*, No. 05-CV-469-S-LMB, 2007 WL 2782246, at *14 (D. Idaho Sept. 21, 2007) ("[P]risoners have no right to barter . . . and inmates' desire to barter need not be accommodated."). What the DOC cannot do is knowingly deprive Wilkins of a nutritionally adequate diet as a tool to enforce these rules, and the record suggests that at least a genuine dispute exists that it is doing so now. Because the record does not show defendant Miller's personal involvement in this alleged violation, summary judgment will be granted as to Miller but denied as to Wilson.

## C. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. We agree that given the unusual facts of this case, there was not clearly established law from which every reasonable official could infer that Wilson's conduct was unconstitutional. Therefore, she is entitled to summary judgment on Wilkins's claim for money damages, leaving only his claim for injunctive relief.

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Qualified immunity applies to government officials performing discretionary functions unless (1) the "facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation," and (2) the alleged right was clearly established at the time of the violation. *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023). For a right to be clearly established, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011)). A clearly established right is one so apparent that "every reasonable official would understand that what he is doing is unlawful." *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

Although the evidence precludes summary judgment, we do not find clearly established law sufficient to put these issues "beyond debate." Specifically, we do not find case law that clearly delineates a prison official's obligations when a prisoner continually obtains food that is "non-compliant" with his needed medical diet, but is not consuming that food.[10] Therefore, summary judgment will be granted on Wilkins's claims

---

[10] For example, *Phoenix v. Amonette*, 95 F.4th 852 (4th Cir. 2024), although instructive, is distinguishable from this case. In *Phoenix*, the plaintiff reported "vomiting blood" and "sharp abdominal pain" to a prison doctor, was sent to an emergency room, and returned to the prison with a diagnosis of Celiac disease and instructions for a "strict gluten free diet." That diet was discontinued by the same doctor within a week, based in part on "reports" that the prisoner had obtained gluten-containing foods from the commissary. 95 F.4th at 855. Although *Phoenix* demonstrates that commissary use is not dispositive of medical need, there is no indication that the plaintiff in that case was trying to possess gluten-containing foods on an ongoing basis.

for monetary damages, and the case will proceed on his claim for injunctive relief against Wilson.

## V.    MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Wilkins also requested preliminary injunctive relief. As described above, the record suggests that Wilson is denying Wilkins a medical diet despite her awareness of his need for that diet. Therefore, we will order that Wilkins be re-evaluated and provided a medically appropriate diet.

Preliminary injunctive relief is an "extraordinary remedy," for which the movant "must establish entitlement to relief by clear evidence." *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018). On a request for preliminary injunctive relief, courts consider four factors: (1) whether there is a "reasonable probability" of success on the merits, (2) whether denial would cause irreparable harm to the plaintiff, (3) whether the relief would cause greater harm to the non-moving party, and (4) whether the relief would be in the public interest. *See Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-03 (3d Cir. 2022). The first two factors are "prerequisites that the moving party must establish." *Id.* (citing *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116,

133 (3d Cir. 2020)). These two factors "are correlative: that is, the weaker the merits showing, the more will be required on the showing of irreparable harm, and vice versa." *Camacho Lopez v. Lowe*, 452 F. Supp. 3d 150, 163 (M.D. Pa. 2020) (citations omitted). In the prison context, "[p]reliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a).

Wilkins has demonstrated a reasonable probability of success on the merits of his Eighth Amendment injunctive relief claim. Most prominently, the evidence suggests that the medical staff have acknowledged his apparent need for the diet even after it was discontinued, and that "if [Wilkins] agreed to sign the therapeutic rules, [Wilson] would approve his diet again." *See* § IV.B, *supra*. The evidence indicates that Wilkins has suffered from gas, bloating, stomach pain, diarrhea, and excessive bowel movements, which can constitute irreparable harm justifying preliminary injunctive relief. *See*, *e.g.*, *Holleman*, 2020 WL 2097783, at *2-3 (Celiac inmate's "pain, cramps, and diarrhea" following revocation of gluten-free diet constituted irreparable

harm); *Berry v. Aramark Corr. Servs., LLC*, No. 1:18-CV-03651-JRS-MPB, 2020 WL 374436, at *2-3 (S.D. Ind. Jan. 23, 2020); *Pineida v. Lee*, No. 12-CV-01171-JST, 2014 WL 4802745, at *4 (N.D. Cal. Sept. 25, 2014).

Defendants argue that Wilkins is not suffering irreparable harm because he can still "opt for those trays and foods which he knows to be non-allergenic." This characterization ignores the undisputed evidence of what he is actually eating. After the diet was revoked, he initially relied on commissary to obtain gluten-free food, but he reported to the medical staff that it "became too expensive for him to maintain." By defendants' own admission, the "regular" trays now served to Wilkins are unsuitable for someone with Celiac disease. *See* (Doc. 36-9, ¶ 12). Defendants' analogy to a case in which a prison provided "several food lines in the dining room from which inmates [could] self-select" (*Askew v. Paone*, No. 3:10-CV-2401, 2012 WL 1677278, at *7 (M.D. Pa. Jan. 11, 2012)) is unpersuasive, particularly when defendants are simultaneously arguing that Wilkins should not have "an *a la carte* experience." (Doc. 37 at 25).

The third factor, the possibility of greater harm to the non-moving party, favors Wilkins. In the prison context, courts must treat such concerns "with great caution because of the intractable problems of

prison administration." *Milhouse v. Fasciana*, 721 F. App'x 109, 111 (3d Cir. 2018) (quotation and citation omitted). However, in this case, a narrowly tailored injunction imposes no greater burden on the DOC than what it has done for years to accommodate Wilkins's dietary needs, consistent with its constitutional obligation to any inmate for whom it is unsafe to eat gluten or corn.

As to the fourth factor, we find that limited, narrowly drawn injunctive relief is in the public interest. Although "[t]he public has an interest in judicial deference to prison officials," *Scott v. Aguleri*, No. 24-CV-6077, 2025 WL 823946, at *5 (E.D. Pa. Mar. 13, 2025), it also has an interest "that government employees, including prison officials and staff, do not violate the Constitution." *Kendrick v. Little*, No. 2:23-CV-187, 2023 WL 6130605, at *8 (W.D. Pa. Sept. 18, 2023). We defer to the prison's medical professionals to assess Wilkins's medical needs, as that is the "least intrusive means" to secure his constitutional rights. *See* 18 U.S.C. § 3626(a). However, we will order that he receive an updated medical evaluation, to ensure that he is not deprived the constitutional minimum of a "nutritionally adequate" diet for a non-medical reason.

## VI. CONCLUSION

For the foregoing reasons, defendants are entitled to summary judgment on (1) all retaliation claims, due to the lack of evidence of a retaliatory basis for their actions; (2) all claims against Miller, due to her lack of personal involvement; and (3) all claims for monetary damages, because defendants are entitled to qualified immunity. The case proceeds on Wilkins's Eighth Amendment injunctive relief claim against Wilson.

Wilkins's request for preliminary injunctive relief will be granted in part. Within 21 days of this memorandum and order, Wilson and/or other appropriate staff must medically evaluate Wilkins for a therapeutic diet. Wilson must file a notice with the Court (1) describing the outcome of the evaluation; (2) specifying the diet, if any, for which Wilkins has a medical need; and (3) confirming that Wilkins is receiving the necessary diet. If the evaluation indicates that Wilkins does not require a therapeutic diet, the notice shall detail the basis for that conclusion, with reference to up-to-date medical evidence.

An appropriate order follows.

Dated: June 25, 2026                  *s/Joseph F. Saporito, Jr.*
                                      JOSEPH F. SAPORITO, JR.
                                      United States District Judge

- 27 -